HERBERT NEW & DAVID W. NEW, P.C.
1129 Bloomfield Avenue, Suite 215
West Caldwell, New Jersey 07006
862-210-8220
Attorneys for Daniel Dymond

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL E. DYMOND, | CIVIL ACTION NO. |
| Plaintiff | COMPLAINT |
| vs. | |
| JOSEPH SELLERS, JR., RON PALMERICK, JOHN BOSKE, BRUCE STOCKWELL, BRUCE WORD, PHIL MEYERS, RICH McCLEES and THOMAS SZYMCZAK, and/or their successors, in their capacity as present and former Trustees of the SHEET METAL WORKERS' NATIONAL PENSION FUND, and the SHEET METAL WORKERS' NATIONAL PENSION FUND, | |
| Defendants | |

PLAINTIFF, Daniel Dymond, by his attorneys, Herbert New & David W. New, P.C., bring this action against Defendants, Joseph Sellers, Jr., Ron Palmerick, John Boske, Bruce Stockwell, Bruce Word, Phil Meyers, Rich McClees and Thomas Szymczak, and/or their successors, in their capacity as present and former Trustees of the SHEET METAL WORKERS' NATIONAL PENSION FUND ("Board of Trustees"), and the Sheet Metal Workers' National Pension Fund ("Pension Fund") under the Employee Retirement Income Security Act of 1974 as amended ("ERISA") as follows:

I.    **PARTIES**

1.    Plaintiff, Daniel Dymond is an adult individual currently residing at 41 Woodbury Road, Farmingville, NY.

2.      Defendant, Sheet Metal Workers National Pension Fund ("Pension Fund") is a pension fund within the meaning of ERISA §3(2), providing retirement benefits for sheet metal workers and others, around the United States, including workers and retirees within this district.

3.      Defendant Joseph Sellers, Jr. ("Sellers") is a labor trustee of the Pension Fund and is charged with the duty to administer these funds in accordance with all applicable laws, the Pension Fund's Plan Documents and its Declarations of Trust.

4.      Defendant Ron Palmerick ("Palmerick") is a management trustee of the Pension Fund and is charged with the duty to administer these funds in accordance with all applicable laws, the Pension Fund's Plan Documents and its Declarations of Trust.

5.      Defendant John Boske ("Boske") is a labor trustee of the Pension Fund and is charged with the duty to administer these funds in accordance with all applicable laws, the Pension Fund's Plan Documents and its Declarations of Trust.

6.      Defendant Bruce Stockwell ("Stockwell") is a management trustee of the Pension Fund and is charged with the duty to administer these funds in accordance with all applicable laws, the Pension Fund's Plan Documents and its Declarations of Trust.

7.      Defendant Bruce Word ("Word") is a labor trustee of the Pension Fund and is charged with the duty to administer these funds in accordance with all applicable laws, the Pension Fund's Plan Documents and its Declarations of Trust.

8.      Defendant Phil Meyers ("Meyers") is a management trustee of the Pension Fund and is charged with the duty to administer these funds in accordance with all applicable laws, the Pension Fund's Plan Documents and its Declarations of Trust.

9.      Defendant Rich McClees ("McClees") is a labor trustee of the

Pension Fund and is charged with the duty to administer these funds in accordance with all applicable laws, the Pension Fund's Plan Documents and its Declarations of Trust.

10.    Defendant Thomas Szymczak ("Szymczak") is a management trustee of the Pension Fund and is charged with the duty to administer these funds in accordance with all applicable laws, the Pension Fund's Plan Documents and its Declarations of Trust.

## II.    JURISDICTION AND VENUE

11.    Plaintiff brings this action pursuant to 29 U.S.C. §1132(a)(1)(B); ERISA Section 502(a)(1)(B); 29 U.S.C. §1132(a)(2); ERISA Section 502(a)(2);  and 29 U.S.C. §1132(a)(3); ERISA Section 502(a)(3). Jurisdiction is founded upon 28 U.S.C. § 1331 and the provisions of ERISA, 29 U.S.C. § 1001, et seq., and without limitation subsection 1132(e) and (f). This Court also has jurisdiction pursuant to 28 U.S.C. § 1332.

12.    Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c) and 29 U.S.C. § 1132(e)(2).

## III.    FACTS

### A. The Sheet Metal Workers' National Pension Fund

13.    The Pension Fund is an employee pension benefit plan within the meaning of §3(2)(A) of ERISA, 29 U.S.C. 1002(2)(A), and a multi-employer plan within the meaning of §3(37)(A) of ERISA, 29 U.S.C. 1002(37)(A). The Fund has its principal office in Alexandria, Virginia and provides pension benefits to participants, including the Plaintiff, in the Eastern District of New York.

14.    The Pension Fund provides monthly pension benefits to eligible participants and their beneficiaries pursuant to the provisions of the Sheet Metal

Workers' Pension Fund Plan Document (hereinafter "Pension Plan" or "Plan").

15.    The Pension Plan document was recently amended and restated in 2014, incorporating "all amendments through September 16, 2014". A copy of the current Pension Plan is attached hereto as Exhibit A, without Appendices.[1]

16.    Article 2.01 of the Pension Plan states, in general, that the Pension Plan was established to provide retirement benefits for employees who are represented for the purpose of collective bargaining by a Sheet Metal Union Local.

17.    Prior to September 1, 1999, "owner-members" (owners of businesses who were members of an affiliated Sheet Metal Union Local and performed union work) were accepted as a Special Class of employees for purposes of participation in the Fund as long as they met certain conditions. See Appendix A.

**B. Fund's Rules Regarding "Retirement" and Providing for a 55/30 Early Retirement Pension**

18.    Eligibility to collect a pension benefit is conditioned in part upon a participant's "retirement". A participant is considered "retired" if he has ceased working in Covered Employment, as well as any employment defined as Disqualifying Employment, and such cessation of work is intended to be permanent. See Section 5.01 of the Plan. Exhibit A.

19.    Covered Employment is defined as "work performed by an Employee on behalf of one or more Contributing Employers in his capacity as a Covered Employee".

---

[1] On January 13, 2015 Plaintiff's counsel requested from Defendant's counsel a copy of the Plan Documents in effect in April 2003 and April 2012, the dates relevant to these causes of action. In response, Defendant's counsel stated that he did not have access to "those historical documents" but would request them from the Pension Department. No additional documentation has been forwarded to Plaintiff's counsel and therefore Plaintiff must rely on the provisions of the 2014 Plan Document, assuming for the purposes of this pleading that the same provisions are found in the "historical documents". Plaintiff reserves the right in discovery to compel production of the applicable Plan documents.

See Section 1.14.

20.     Article 1 of the Pension Plan provides a list of definitions. No definition is provided for the term "work".

21.     The Pension Plan offers various forms of early retirement pensions, including one for participants who have attained age 55 and have earned a certain number of pension credits.

22.     A "55/30 Pension" is one   type of retirement benefit provided for a participant who:

> retires on or after January 1, 2006 shall be eligible for a 55/30 Pension as described in this Section 5.09 if he (i) satisfies the requirements of Section 5.07 for Special Early Retirement, (ii) has 360 months of Future Service Credit, (iii) has 3,500 Hours of Work at the 55/30 Rate within the five calendar year period immediately preceding the calendar year in which he applies for a pension, and (iv) has at least 60 months, out of the last 120 months, of Future Service Credit in a position that, prior to his retirement, is or becomes subject to the 55/30 Rate; provided, that,  for Effective Dates of Pension on or after February 1, 2014, the 55/30 Pension is an applicable type of Early Retirement Pension Under Section 5.04.

See Section 5.09(a)(1).

23.     In the event a participant leaves Covered Employment, the Pension Plan provides:

> if a Participant or Employee, or former Participant or Employee, at any time after his Contribution Date [date when contributions commenced] performed or performs at least one (1) hour of employment on or after September 1, 1988 in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer, the Participant will not be eligible to retire pursuant to the provisions of this Section 5.09 [55/30 Pension].

5

See Section 5.09(d)(1).

In other words, if a Participant works a mere one (1) hour of non-union work during his thirty(30) years of service, (i.e. weekend work) he will be ineligible for the 55/30 Pension.

24.     The Pension Plan further provides that there will be a waiver of the Section 5.09(d)(1) ineligibility for the 55/30 pension (quoted in Par. 23 above) if the "Employee returns to Covered Employment and earns a number of months of pension credit equal to the number of months during which he was previously employed for at least one hour in the sheet metal industry in a position not covered by a CBA between the Union and the Employer." See Section 5.09(d)(2) (emphasis added).

25.     Subsection 5.09(d)(2) specifically refers to an Employee who "returns" to Covered Employment which, by necessity, requires one to leave Covered Employment. Therefore if a participant continues in Covered Employment, but simultaneously engages in non-Covered Employment (for example earning extra income on weekends), it could not render that participant ineligible for the 55/30 pension, as he never left and returned to Covered Employment. See Section 5.09(d)(2). The Plan does not address this issue, indicating that its intent was to cover any of those participants who leave Covered Employment for some period to work in a non-union job and then return to Covered Employment.

**C. Fund's Rules Regarding Overpayments, Recoupment and Offsets**

26.     The Pension Plan contains no provisions for self-help or offset in the event the Pension Fund over pays a pension due to clerical error or otherwise.

6

27.     The only offset provisions in the Pension Plan address the event when a participant is paid a pension benefit in a month in which he is engaged in "Disqualifying Employment". In addition, the Plan provides that the Trustees may "recoup, by offset, actuarial adjustment or other reasonable arrangement, any amounts that are paid from the Plan to the Participant … in excess of the correct amount due, <u>as permitted by Treas. Reg. §1.401(a)-13(c)(2)(iii)</u>." That regulation requires an "arrangement" to be "previously made to a participant". No "arrangement" was made with Plaintiff. See Section 8.05(a)(5). In addition, the Fund never cited any "arrangement" in its denial letters. The regulation also does not permit a Plan to "recoup, offset [or make] actuarial adjustments", it only provides  for "reasonable arrangments". See Section 8.06(g).

28.     Disqualifying Employment is defined by the Plan to include "employment with an employer in the same or related business as any Contributing Employer or employment in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer". See Section 8.06(d).

29.     Any overpayment attributable to payments for any month for which the Participant has worked in Disqualifying Employment shall be deducted from pension payments otherwise paid or payable subsequent to the period of suspension, but shall not exceed 25 percent of the pension amount after the Pensioner attained Normal Retirement Age (age 65). See Section 8.06(g).

**D. Review Process**

30.     Pursuant to the Plan, the Trustees are charged with the "sole and absolute power, authority and discretion to determine ….the entitlement to or amount of a pension". See Section 8.03.

7

31.    Any Participant "whose application for benefits under the Plan has been denied, in whole or in part, is to be provided with adequate notice in writing setting forth the specific reasons for such denial, and shall have the right to appeal the decision by filing a written request with the Trustees within 180 days after receipt of such notice". See Section 8.04.

**E. Plaintiff's Work History**

32.    The Plaintiff was a participant of the Pension Fund within the meaning of §3(7) of ERISA, 29 U.S.C. 1002(7).

33.    The Plaintiff resides in Farmingville, New York.

34.    Plaintiff was born on March 15, 1947 and obtained the age of 55 on March 15, 2002.

35.    In July 1966, Mr. Dymond became a participant in the Sheet Metal Workers National Pension Fund, as a member of SMW Local 55, which later merged with SMW Local No. 28.

36.    In March 1983, Plaintiff became a stockholder of Blue Diamond Sheet Metal ("Blue Diamond"), a contributing employer to the Pension Fund.

37.    Plaintiff continued to be an active participant of the Pension Fund, having contributions made on his behalf until his retirement.

38.    On or about 1990, Mr. Dymond applied for "special class participation" of Blue Diamond in order to allow him, and others, to continue being participants of the Pension Fund.

39.    Being a special class participant, Mr. Dymond was required to pay the Plan at the same rate as other union employees of Local No. 28, making him eligible for the

same retirement benefits as other Local 28 participants. In fact, he was required to pay more hours than a regular participant.

40.     Blue Diamond continued to pay contributions on Mr. Dymond's behalf who in turn continued to earn pension credits with the Fund.

41.     In January 2001, Plaintiff sold his shares in Blue Diamond to Robert Lawless, Douglas Belz, Stephen DiMeglio and James Dvorak ("Purchasers") for a fixed price, thereby relinquishing his entire 50% share. Plaintiff continued to work at Blue Diamond for two (2) years, from 2001 – 2003.

42.     Due to the fact that the Purchasers did not have the financial capability of paying Dymond the value of his shares in a lump sum, an agreement was reached to pay Plaintiff over a number of years.

43.     In connection with the sale of his shares of stock in Blue Diamond, Plaintiff simultaneously entered into a Consulting Agreement and an Agreement Not to Compete with the Purchasers, as Plaintiff had no intention of staying in the Sheet Metal Industry, in any capacity.

44.     To facilitate payment for his shares, Plaintiff created FAD Consulting Corp. (FAD) in March 2001, an entity whose sole purpose was the receipt and distribution of payments from Purchasers for the Plaintiff's shares.

45.     FAD never performed any sheet metal work, or any other work of any nature, despite its title containing the term "Consulting". FAD at all times was exclusively a vehicle to receive payments from Purchasers.

46.     Plaintiff's employer, Blue Diamond, continued to submit contribution reports to the Plan (and made contributions) showing Plaintiff's hours of work up to the

9

month in which he retired, March 2003.

47.    Plaintiff continuously worked in Covered Employment up to his retirement in March, 2003.

48.    While FAD received stock purchase payments from 2001 – 2003, Plaintiff never left Covered Employment prior to his retirement. The Pension Plan is aware of this continued employment.

49.    Upon information and belief, the Pension Fund is aware of several "special class" or other participants that sold their businesses and received consideration in a similar form to Plaintiff.

**F. Dymond's Pension Application and Retirement**

50.    As he neared retirement, Plaintiff contacted the Pension Fund regarding his eligibility for a 55/30 Pension.

51.    The Fund informed Plaintiff on February 27, 2003, that assuming a pension effective date of April 1, 2003, Mr. Dymond would qualify for a 55/30 pension because he attained the age of 55, earned a minimum of 360 months of future service credit, earned 24 credits at the 55/30 contribution rate, never worked in non-signatory employment in the sheet metal industry and had been employed 60 of his last 120 months of "future service credit" in the class certification that is, or has become, covered by the 55/30 contribution rate.

52.    Pursuant to his pension application, the Fund asked Mr. Dymond to complete a Social Security Administration Authorization form  (SSA Form) in order to verify earnings, which Plaintiff completed on March 20, 2003, signing in blank.

53.    The Fund's actions gave the clear impression that as long as Mr. Dymond

provided all the information requested and complied with all requests, the Pension Fund would properly calculate his pension benefits and determine his eligibility to retire.

54.    In the center of the SSA Form, to be completed by the Pension Fund, is a space to fill in the period for which earnings history is requested. See Exhibit B.

55.    The Pension Fund, rather than taking the opportunity to request earnings history for the 30 years of Plaintiff's service in an effort to verify that he never left Covered Employment (thus rendering him eligible for the 55/30 Pension under Section 5.09(d)(1)), only requested earnings for the period 1966 through 1971.

56.    Mr. Dymond applied for a pension in March 2003 and signed a Retirement Declaration and Acknowledgment, acknowledging that he would not **work** in Disqualifying Employment, as that term is defined in Section 8.06 of the Pension Fund Plan Rules. See Exhibit C.

57.    After the Pension Fund's analysis of Plaintiff's work history, Mr. Dymond's pension was approved effective April 2003 with a monthly payment of $3,042. Upon his death, Plaintiff's wife was to receive the same amount for her lifetime.

58.    Mr. Dymond thereafter received monthly payments in the amount of $3,260. The increase was due to an adjustment made in May 2003 to compensate for Plaintiff's military time, by virtue of the earnings report received in response to the SSA Form.

59.    During the period May 2003 through April 2014, Dymond exclusively, and without any interruption, except for weather and vacationing in Florida, engaged in the commercial fishing industry in Long Island, NY.

60.    The Pension Fund never questioned any of Dymond's income, nor did they

ever request any information from him, until 2013.

61.    Dymond continued to rely on his monthly pension benefits, and anticipated a lifelong monthly income from this pension, planning his financial future and estate on such assumption.

62.    Dymond opted to apply for early retirement, and selling his business at age 53, mostly in reliance of being eligible for a 55/30 Pension, such actions were made after assurances from the Pension Fund that he would be entitled to such a pension for his life. Had the Pension Fund informed him of his ineligibility in 2003, Plaintiff would have stayed on as owner and employee of Blue Diamond, continued to accrue additional pension benefits and additional income from his business, and most likely realize appreciation of the value of his shares.

63.    After receiving monthly pension benefits for approximately 11 years, the Pension Fund sent a letter to Mr. Dymond in approximately June, 2013 for the first time since retirement requesting his signature on another SSA Form. Having nothing to hide, Plaintiff dutifully and timely complied.

64.    The Social Security Administration report in response to the June 2013 SSA From showed that Mr. Dymond earned income from FAD for the years 2001 through 2008.

65.    No earnings from 2009 through 2013 were reported by SSA.

66.    Approximately six months later, on February 12, 2014, the Pension Fund sent a letter to Plaintiff informing him that the Pension Fund reviewed the SSA earnings data and requested assistance "[i]n order to make a determination". No indication of what the Fund's underlying issue was or why the information was needed was provided in the

letter. The Pension Fund merely requested a description of the services provided by FAD, job title, job description and Union affiliation (if any).

67.    In response Plaintiff, without the assistance of counsel and without knowledge that his pension benefits were in any jeopardy, provided a half page handwritten response by copying the language verbatim from the Consulting Agreement between Blue Diamond and FAD, stating that he had earned income from FAD, and that it was an "independent consulting company, that assisted companies through verbal conversations, but that he did not engage in physical work".

68.    While the Consulting Agreement contained such language, FAD and Plaintiff never performed ANY consulting work during Dymond's retirement.

69.    The Pension Fund did not request any additional documentation or further explanation from Plaintiff, nor did the Pension Fund explain (and has not to date) why it waited approximately eleven (11) years after Plaintiff's retirement to investigate his post-retirement income and/or employment.

70.    In response, the Pension Fund, in a letter dated April 2, 2014, stated that it deemed the income Plaintiff earned through FAD demonstrated work pertaining to the Sheet Metal Industry and was considered Disqualifying Employment under the Pension Plan. See Section 8.06(d)(1)(B) and (E). A copy of the April 2, 2014 letter is attached hereto as Exhibit D.

71.    As a result, the Pension Fund stated not that Plaintiff had engaged in Disqualifying Employment (which would result in a suspension of benefits and possible recoupment limited to 25% reduction from future benefit payments), but rather it deemed that Plaintiff never "retired" because Plaintiff was engaged in Disqualifying

Employment at the time he applied for a pension. See Exhibit D, page 2.

72.     The Pension Fund concluded that Plaintiff was "not due **any of the pension and your application is denied"** (emphasis added).

73.     Presumably, the Pension Fund was referring to Plaintiff's pension application from **2003**, 11 years prior to its letter notice.

74.     Over that 11 year period of time, there was no indication from the Pension Fund that Mr. Dymond's application was still "under review" or capable of being "denied".

75.     As a result of this conclusion, the Pension Fund stated it "will require reimbursement for all payments received through April 2014 to date totaling $437,510" and would cease making monthly benefit payments. See Exhibit D, page 2.

76.     In addition, the Pension Fund deemed Plaintiff ineligible for the 55/30 pension, the specific type of pension that allowed Plaintiff to retire upon attainment of age 55.

77.     In addition, the Pension Fund never mentioned in its April 2, 2014 letter that any income received from FAD prior to 2003 rendered Plaintiff ineligible for the 55/30 pension under Section 5.09(d)(1).

78. The Pension Fund also stated that it would recover the "overpayment by withholding 100% of [his] pension payments at the time you make application for benefits". See Exhibit D, page 2. In essence, Plaintiff was advised that (1) he never retired (2) was in receipt of $437,510 in error (3) that he could re-apply for a normal pension as of his 65th birthday; and (4) that he would not receive any of his normal retirement or any other pension until the full amount of the $437,510 (plus interest) is

recouped.

79.    No citation to the Plan Rules or the Fund's ability to offset 100% of subsequent payments was provided in the letter.

80.    Upon information and belief, the Pension Fund is aware that other participants, similar situated to Plaintiff, are under the impression that earning income from a passive entity is not considered "work" and would not disqualify them for a pension. However, the Pension Fund has failed to clarify its Plan to define the term "work", permitting it to rigidly interpret its provisions and avoid paying pensions.

81.    In all likelihood, given this unsupported act of self-help, Plaintiff and his wife will never receive a pension payment.

82.    In fact, the Fund seeks reimbursement from Plaintiff for pension payments received through **April 2014**, when the Pension Fund was well aware that Plaintiff discontinued earning any income from FAD after **2008**, and also knew that Plaintiff reached Normal Retirement Age, entitling him to a regular pension, in March 2012.

83.    If the Pension Fund had deemed Plaintiff "retired", but in Disqualifying Employment, through 2008, they would be forced to continue paying his pension, but limited to recoup any overpayment by reducing his monthly pension benefit by 25% (25% Rule).  See Exhibit A, Section 8.06(g).

84.    The Fund's unsupported and questionable interpretation of its rules is nothing more than an attempt to avoid the specific 25% Rule and paying Plaintiff a pension.

**G. Pension Fund's Financial Troubles**

85.    The Pension Fund has had underfunding issues for many years and, in fact,

for six consecutive years it was determined by their actuary to be in "Critical Status", as defined by ERISA.

86.     According to its 2013 Notice of Critical Status, as of April 2013, the Pension Fund's funding percentage was less than 56.79% and was projected to have an Accumulated Funding Deficiency within five years.

87.     Based on its dire financial position, the Pension Fund has commenced reducing benefits to its participants and beneficiaries whose benefit commencement date is on or after March 1, 2008.

88.     It is in the best interest of the Pension Fund to avoid making pension payments even to its eligible participants due to its current financial condition.

**H. Plaintiff's Appeal Process**

89.     Plaintiff's counsel appealed the findings of the Pension Fund's determination letter of April 2, 2014, via a letter dated July 8, 2014. See Exhibit E.

90.     The appeal letter provided evidence that FAD was not in the Sheet Metal Industry and that Plaintiff did not perform work covered by the Pension Fund.

91.     In addition, the appeal demonstrated that after his retirement, Plaintiff was exclusively engaged in the commercial fishing industry (literally in a boat fishing) and the income earned through FAD was not for any performed "work", it was simply an entity that accepted payments pursuant to Plaintiff's sale of stock in Blue Diamond.

92.     The Pension Fund Appeal Committee (Appeal Committee), in a letter dated September 19, 2014, denied Plaintiff's appeal. A copy of the denial letter is attached hereto as Exhibit F.

93.     The Appeal Committee determined that Plaintiff's employment at FAD

was Disqualifying Employment and as a result, deemed that Plaintiff had not "retired" in 2003 and was never eligible for the 55/30 pension.

94.    The denial letter also stated:

> Even had he not been engaged in Disqualifying Employment, he did not qualify [for] a 55/30 Pension in accordance with the Plan section 5.06(d) due to his work in non-signatory employment, and would have been subject to early retirement delays as provided under Plan Section 5.05.

See Exhibit F. Presumably, the Pension Fund was referring to Section 5.09(d), not Section 5.06(d).

95.    The April 2, 2014 letter (notifying Plaintiff that his pension payments would cease and of his right to appeal) never advised Plaintiff that he was determined to be ineligible by reason of any non-covered employment prior to his retirement. The appeal denial of September 19, 2014 was the first time Plaintiff was so advised.

96.    Plaintiff was never given an opportunity to appeal this portion of the decision, although requested, in clear violation of the Pension Rules appeal process.

97.    In making this determination, the Appeal Committee exclusively relied upon the SSA earnings data and Plaintiff's handwritten note. It disregarded all reference to Plaintiff's fishing business.

98.    The Appeal Committee claims that the Trustees administer the Plan according to its terms, but provide no basis for withholding 100% of Plaintiff's pension payments.

99.    The Appeal Committee stated that its decision was final and binding, not allowing any further submissions of documents, information or appeal.

100.    Despite forwarding hundreds of pages of Fishing Vessel Trip Reports for the years 2001-2008 (over 740 reports), which are mandated by the National Oceanic

and Atmospheric Administration, affidavits (including a principal of Blue Diamond attesting that Plaintiff performed no consulting service) and other information, the Fund refuses to consider any information whatsoever after its September 19, 2014 letter.

101.    In fact, Defendants' counsel, in an email dated December 30, 2014, confirmed that the "record in this case is limited to the information that was made available to the Appeals Committee ....[and] the record in this case may not be supplemented with additional submission".

102. The Trustees' refusal to allow further supplementation of Plaintiff's appeal, especially after a decision based in part on a finding made for the first time in their denial letter of September 19, 2014, is tantamount to a denial of a fair and reasonable review.

103.    Plaintiff attained age 65, Normal Retirement Age, in March 2012.

104.    There is no evidence of Plaintiff's employment with any employer since 2008.

105.    Upon information and belief, the Pension Fund granted Plaintiff a normal pension (since he attained age 65), without application, but have failed to supply this information to Plaintiff or the calculation of the benefits entitled to Plaintiff.

106.    In addition, the Pension Fund has never made any "arrangement" with Plaintiff to recover any alleged overpayment or to offset his pension benefits.

107.    By their own admission, Plaintiff qualified for a pension at age 65, but still refuses to pay any pension benefit.

108.    Plaintiff has been denied his rightful pension benefits.

## COUNT I

### FAILURE TO PROVIDE BENEFITS UNDER ERISA

109.    Plaintiff realleges and incorporates by reference paragraphs 1 through 108 above.

110.    The determination that Plaintiff was not "retired", not entitled to a 55/30 Pension and/or that the "work" he engaged in was "Disqualifying Employment" as defined by the Pension Plan in Section 8.01(d)(1)(B) or (E) was not the result of fair analysis, but rather an arbitrary and capricious decision reached by the Trustees of the Plan.

111.    The Pension Fund violated the requirements of 29 U.S.C. §1132(a)(1)(B), by failing to provide benefits under the Plan for which Plaintiff was eligible despite Plaintiff's request for benefits.

112.    The denial of these benefits by the Pension Fund was arbitrary, capricious, not made in good faith, unsupported by substantial evidence, an abuse of discretion, erroneous as a matter of law, and in violation of ERISA.

113.    As a direct and proximate result of the Pension Fund's actions, Plaintiff has lost 100% of his retirement benefits owed to him since April 2, 2014.

114.    As a direct and proximate result of the Pension Fund's actions, Plaintiff has been caused to incur attorneys' fees in an attempt to secure payment of Pension benefits justly due to him.

### COUNT II

### DECLARATORY JUDGMENT PURSUANT TO 29 U.S.C. § 1132(a)(1)(B)

115.    Plaintiff realleges and incorporates by reference paragraphs 1 through 114

above.

116.    Pursuant to 29 U.S.C. § 1132(a)(1)(B), the Plaintiff is entitled to a declaratory judgment concerning his rights to future benefits due under the Plan.

117.    By reason of the foregoing, the Plaintiff is entitled to judgment of this Court declaring that he is entitled to receive future pension benefits and retention of all benefits received under the Plan pursuant to the terms of the Plan.

<u>**COUNT III**</u>

<u>**WAIVER (29 U.S.C. §1132(a)(3)**</u>

118.    Plaintiff realleges and incorporates by reference paragraphs 1 through 117 above.

119.    Prior to his retirement in 2003, Plaintiff made specific inquires to confirm his eligibility for a 55/30 Pension.

120. The Pension Fund provided, in writing, confirmation that Plaintiff was indeed eligible for the 55/30 Pension.

121. Being eligible for this specific pension was of great importance to Plaintiff as it allowed him to retire early, provide financial security for himself and his spouse, and allow him to discontinue working for Blue Diamond.

122.    During his retirement application process, the Pension Fund required that Plaintiff submit certain documentation, including the SSA Form.

123.    Plaintiff rightfully assumed that any information the Fund needed to verify his eligibility would be obtained, and if lacking, would be obtained through follow up inquiries.

124.     Plaintiff rightfully assumed that if his pension benefits were being paid,

that the Pension Fund had approved his pension application and deemed the Plaintiff to be "retired".

125.   Not until 2013 did the Pension Fund ever make any inquiry or provided Plaintiff with any indication that his retirement application was still being reviewed or that he was not eligible for the 55/30 Pension.

126.   As a result of the Pension Fund's conduct described herein, especially its failure to require employment information from Plaintiff for over 11 years or to properly request all earnings data subsequent to Plaintiff's pension application in 2003 and despite having all the necessary and relevant information and opportunity to do so since 2003, the Pension Fund has knowingly and voluntarily waived any rights that it may have otherwise had to recalculate Plaintiff's monthly benefits or recoup any alleged overpayment made to Plaintiff.

127.   This Court should therefore order entry of Declaratory Judgment that (a) the Pension Fund has waived its rights (to the extent it had them) to recalculate or reduce Plaintiff's monthly retirement benefit amount and/or to recoup any alleged overpayment made to Plaintiff, and that as a result of such waiver the Pension Fund should pay Plaintiff the benefits it had wrongfully withheld since April 2014.

## COUNT IV

## ESPTOPPEL (29 U.S.C.§1132(a)(3)

128.   Plaintiff realleges and incorporates by reference paragraphs 1 through 127 above.

129.   Under the federal common law of ERISA, an estoppel arises when one person makes a definite misrepresentation of fact to another person having reason to

believe such person does rely on that act.

130.   In this matter, the Pension Fund made definite misrepresentations of fact to Plaintiff about his benefit calculation and eligibility which it knew or reasonably should have known would be relied upon by Plaintiff. Plaintiff was unaware, and had no reason to believe, that he was not entitled to a 55/30 Pension.

131.   While the Fund had the opportunity in 2003 to determine Plaintiff's work history, revealing his affiliation with FAD, it imprudently decided not to avail itself of that opportunity. Such gross negligence amounts to a constructive fraud upon Plaintiff.

132.   Plaintiff reasonably relying upon the Pension Fund's misrepresentations for more than eleven years that he was deemed "retired", planned his retirement and estate planning upon the representation that he would be entitled to a 55/30 Pension for life, and decided to sell his business based on those representations.

133.   The facts in this matter amount to extraordinary circumstances.

134.   As such, this Court should order that the Pension Fund is estopped from asserting that Plaintiff was not entitled to his pension benefits and that the Pension Fund be enjoined from taking any action to recoup previously paid pension benefits.

## COUNT V

## BREACH OF ERISA FIDUCIARY DUTIES

## FAILING TO COMPLY WITH DOCUMENTS AND INSTRUMENTS OF THE PLAN

135.   Plaintiff realleges and incorporates by reference paragraphs 1 through 134 above.

136.    The Board of Trustees are fiduciaries under the Pension Fund pursuant to ERISA.

137.   As a fiduciary of the Pension Fund, each of the Trustees are required to discharge their duties to the Pension Fund in accordance with the documents and instruments governing the Pension Fund. 29 U.S.C. §1104(a)(1)(D).

138.   As a fiduciary under the Pension Fund, each of the Trustees are required to apply the rules and regulations delineated under the Pension Plan.

139.   As a fiduciary of the Pension Fund, each of the Trustees are required to strictly comply with the Pension Rules.

140.   The Trustees have failed to meet each of the above-stated fiduciary duties by denying Plaintiff his rights to a pension.

141.   By failing to meet their obligations under the Pension Plan, The Trustees have breached their fiduciary duties in violation of 29 U.S.C. §1104 and are personally liable  for their breaches under 29 U.S.C. § 1109.

## COUNT VI

### FAILURE TO PROVIDE A FULL AND FAIR REVIEW

142.   Plaintiff realleges and incorporates by reference paragraphs 1 through 141 above.

143.   ERISA requires that benefit plans "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by a participant" and to give a "full and fair review". 29 U.S.C. §1133(1).

144.    The regulations promulgated under ERISA require that the "specific reason or reasons" be given in both the initial and the appeal denial letters. See 29 C.F.R. §2560.503-1(g) and (j).

145.    Any decision that falls short of a "full and fair review" is not evaluated under a deferential standard. See Karce v. Bldg. Serv. 32B-J Pension Fund, 2006 U.S. Dist. LEXIS 79818 at *14. (S.D.N.Y. 2006).

146.    The Pension Fund's initial denial letter of April 2, 2014 did not provide Plaintiff with any notice whatsoever that he was determined to have been ineligible by reason of engaging in non-covered employment prior to retirement.

147.    The Appeal Committee denial letter of September 19, 2014 was the first mention that he was ineligible for the 55/30 Pension because of any non-covered work.

148.    Specifically, the September 19, 2014 states that "Even had he not been engaged in Disqualifying Employment, he did not qualify a 55/30 Pension in accordance with the Plan section 5.06(d) due to his work in non-signatory employment, and would have been subject to early retirement delays as provided under Plan Section 5.05.". See Exhibit F.

149.    Plaintiff was never given an opportunity to appeal this portion of the decision and in fact was forbidden to do so, all in clear violation of the Pension Rules appeal process.

150.    In addition, Defendants unreasonably refused to consider documents and other substantial proof of Plaintiff's post-retirement work after the September 19, 2014 letter, claiming his appeal record was closed and final.

151.    Plaintiff was denied his right to a full and fair hearing.

## COUNT VII

## WRONGFUL ALIENTATION OF BENEFITS IN VIOLATION OF ERISA 29 U.S.C. § 1056(d)

152.    Plaintiff realleges and incorporates by reference paragraphs 1 through 151 above.

153.    29 U.S.C. §1056(d), ERISA Section 206(d), mandates that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated".

154.    The Plan also provides "that Participants acquire a nonforfeitable interest in their Accrued Benefit and Normal Retirement Benefit in accordance with certain prescribed standards". See Exhibit A, Section 8.07(a).

155.    ERISA, and its regulations, provide specific limited exceptions to the general rule prohibiting assignment or alienation of a participant's benefits.

156.    None of those exceptions are applicable in this matter nor were any cited in the Appeal Committee's determination letter of September 19, 2014.

157.    Pursuant to ERISA, Defendants have no right to alienate Plaintiff's pension.

158.    Pursuant to ERISA, Defendants have no right to withhold Plaintiff's pension and apply his pension benefits as a recoupment of an alleged overpayment.

159.    All monies the Plan has withheld from Plaintiff was in violation of ERISA and the terms of the Pension Plan.

160.    Defendants have failed to discharge their duties to Plaintiff in accordance

with the documents and instruments governing the Plan and in accordance with ERISA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Daniel Dymond, demands the following relief against the Defendants:

1. A declaration that the Pension Fund is obligated to pay Plaintiff his 55/30 Pension *nunc pro tunc* and to continue payment of his monthly benefits so long as Plaintiff remains retired within the meaning of the Pension Plan for the remainder of his life, and the life of his surviving spouse;

2. Plaintiff be awarded pre-judgment interest, from the denial date of April 2, 2014, to the present;

3. A declaration that the Pension Fund has waived its rights, to the extent it had them, to recalculate or reduce Plaintiff's monthly retirement benefit amount or to recoup any alleged overpayment made to Plaintiff;

4. A declaration that the Pension Fund is estopped from asserting that Plaintiff was not entitled to his pension benefits and that the Pension Fund be enjoined from taking any action to recoup previously paid pension benefits.

5. Personal liability against each member of the Board of Trustees for breach of fiduciary duty;

6. In the event that the Court determines that Plaintiff was not afforded a full and fair hearing, that Plaintiff be given the opportunity to supplement the record of his appeal as previously attempted and order a remand  in this matter to the

Appeal Committee ordering consideration of all additional documents and information;

7.  Plaintiff be awarded reasonable attorneys' fees in addition to litigation expenses and costs; and

8.  Such other and further relief as this Court deems just and appropriate.


HERBERT NEW & DAVID W. NEW, P.C.
Attorneys for Plaintiff


Benjamin A. Karfunkel

Dated: April 9, 2015