**EXHIBIT E**

RECEIVED JUL 2 1 2014

**ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**

875 THIRD AVENUE

NEW YORK, NEW YORK 10022-0123

(212) 603-6300

FAX (212) 956-2164

July 8, 2014

Michael E. Greene
(212) 603-6360
meg@robinsonbrog.c

**VIA CERTIFIED MAIL RRR**
Appeals Committee of the
Sheet Metal Workers National Pension Fund
Board of Trustees
8403 Arlington Boulevard, Suite 300
Fairfax, VA  22031

Re:   **Appeal of Daniel E. Dymond**

Ladies and Gentlemen:

This firm has been retained by Daniel E. Dymond (Mr. Dymond") in connection with a determination dated April 2, 2014, by the Sheet Metal Workers National Pension Fund (the "Pension Fund") disqualifying Mr. Dymond from receipt of Pension Fund benefits. As will be demonstrated herein, Mr. Dymond and FAD Consulting Corporation ("FAD") are not employed in the sheet metal industry and do not perform work covered by the Sheet Metal Workers International Association Constitution ("SMWIA Constitution") or Sheet Metal Workers' National Pension Fund Plan Document (the "Pension Fund Plan"). Since his retirement, Mr. Dymond has not performed any acts associated with his skills and training as a sheet metal worker.

## I.   BACKGROUND

### A. Introduction

Mr. Dymond first joined the Sheet Metal Workers' Union in 1966 when it was known as Local 55. At that time, he was employed by Metal Air Sheet Metal in Freeport, New York. Shortly thereafter, he joined the United States Air Force and served his country until his honorable discharge in June 11, 1970. Upon reentering civilian life, Mr. Dymond renewed his profession in the sheet metal industry and reactivated his status with Local 55. Mr. Dymond thereafter worked for Tri State Heating and Air Conditioning Corp. from 1970 to 1978. From 1978 through 1983, Mr. Dymond was active in Local 55 and continued employment with a number of sheet metal and mechanical contractors on Long Island.

In 1983, Mr. Dymond became a principal in Blue Diamond Sheet Metal Corp. ("Blue Diamond"), located in Centerreach, New York. Between 1984 and 1985, Local

{00681029.RTF;1 }

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

RECEIVED JUL 2 1 2014

55 merged with Local 28 and continues to be associated with Local 28. From 1983 through 2001, Mr. Dymond was not just an employee, but a shareholder, of Blue Diamond. In 2001, Mr. Dymond agreed to sell his interest in Blue Diamond by executing a share purchase agreement (annexed hereto as Exhibit A), and an agreement not to compete (annexed hereto as Exhibit B). Between 2001 and 2003, Mr. Dymond stayed on as an employee and officially retired at the end of 2003. Mr. Dymond has not been employed by, or worked in, the sheet metal industry since that time.

### B. The Sale of Blue Diamond

The purchasers of Blue Diamond lacked the capital to purchase Mr. Dymond's stock in a single bulk payment. Additionally, a bulk payment from Blue Diamond to Mr. Dymond would have generated serious negative tax consequences for the purchasers of Mr. Dymond's stock. As such, Blue Diamond and Mr. Dymond devised a creative structure to purchase Mr. Dymond's assets over time, taking into consideration various corporate and personal taxes.

The purchasers of Blue Diamond and Mr. Dymond engaged professionals (attorneys and accountants) to accomplish the completion of the purchase. Mr. Dymond incorporated FAD Consulting Corporation ("FAD") for the sole purpose of acquiring funds per the share purchase agreement.

As part of the deferred equity for his interest in Blue Diamond, Blue Diamond paid FAD a monthly payment over a five-year period. None of those payments were made in compensation for services rendered or work performed. Indeed, absolutely no work was performed by FAD or Mr. Dymond in the sheet metal industry from 2003-present. Instead, these payments, structured as "consulting fees" for tax purposes, and prior to his leaving, were actually deferred compensation for Mr. Dymond's ownership interest in Blue Diamond.

FAD has never received any other compensation from any other entity precisely because it does not perform work.

### C. Mr. Dymond's Post-Retirement Vocation

Since retiring in 2003, Mr. Dymond has solely been engaged in the fishing industry in Suffolk County, Long Island. Mr. Dymond owns Four Diamond Fish Company, Inc. ("Four Diamond"), a commercial fishing company with one employee – Mr. Dymond. Four Diamond is in the business of catching and selling fish to commercial wholesale purchasers. Mr. Dymond has not performed any work, labor, or services directly or indirectly involving the sheet metal industry at Four Diamond.

## II.   THE CLAIM

The Pension Fund concluded that Mr. Dymond was disqualified from receiving pension benefits due to his association with FAD. In particular, the Pension Fund relies

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

RECEIVED JUL 2 1 2014

on two provisions of the SMWIA Constitution to recoup benefits paid to Mr. Dymond: Sections 5(a) and 5(m). Both sections rely on the performance of actual "work" to disqualify an individual from receiving benefits. The Pension Fund also seeks to recoup benefits under the Pension Fund Plan at §§ 8.06(d)(1)(B) and 8.06(d)(1)(E). Both of these sections rely on actual "employment" to disqualify an individual from receiving benefits.

Prior to analyzing each of these provisions, however, it is necessary to reiterate basic contract interpretation principles. These principles indicate that, based on the plain meaning of the SMWIA Constitution and Pension Fund Plan, benefits paid to Mr. Dymond cannot be recouped because both agreements were only intended to prevent an individual from collecting retirement benefits while still actively employed and working in the sheet metal industry.

### A. Basic Contract Interpretation Principles

"In interpreting a contract, 'words and phrases are given their plain meaning. Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement.'" *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199, 1996 U.S. App. LEXIS 8728, 13 (2d 1996), quoting *American Express Bank, Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990). "Furthermore, where 'the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law . . . ." *PaineWebber Inc. v. Bybyk*, 81 F.3d at 1199, quoting *American Express Bank, Ltd.*, 164 A.D.2d at 277. *See also, Reliastar Life Ins. Co. v. EMC Nat'l Life Co.*, 564 F.3d 81, 88, 2009 U.S. App. LEXIS 7647, 14 (2d Cir. 2009) ("In interpreting a contract under New York law, "words and phrases . . . should be given their plain meaning."), quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

### B. Mr. Dymond Does Not Work, and is Not Employed, in the Sheet Metal Industry

The Pension Fund found that Mr. Dymond is performing work which a sheet metal worker has been assigned, referred or can perform because of his skills and training as a sheet metal worker. Further, the Pension Fund has unilaterally determined that FAD provides services and concluded, without any evidence, that these services are similar to services provided by consultants qualified to work on small and/or large projects.

#### 1. The SMWIA Constitution Does Not Preclude Mr. Dymond From Receiving Retirement Benefits

The Fund relies on two provisions of the SMWIA Constitution to recoup benefits paid to Mr. Dymond: Sections 5(a) and 5(m). The plain meaning of both sections dictate that only an individual performing "work" is ineligible for benefits.

The SMWIA Constitution § 5(a) grants the SMWIA full jurisdiction over the "estimating, project management, manufacture, [and] fabrication, [etc.] . . . . of HVACR and sheet metal work." (emphasis added).

Section 5(m) grants the SMWIA full jurisdiction over "[a]ny and all types of sheet

{00681029.RTF;1}

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

RECEIVED JUL 2 1 2014

metal <u>work.</u>" *Id.* (emphasis added).

As stated previously, Mr. Dymond has not worked in the sheet metal industry since retiring in 2003. FAD has never performed any work whatsoever. Mr. Dymond is associated with FAD for the sole purpose of collecting payment for his ownership interest in Blue Diamond. These payments ended in 2011. None of the provisions cited by the Pension Fund disqualify Mr. Dymond from receiving payment for his ownership interest. The plain meaning of §§ 5(a) and 5(m) only preclude "work." Because Mr. Dymond and FAD performed no work, §§ 5(a) and 5(m) do not disqualify Mr. Dymond from receiving benefits from the Pension Fund.

   2. *The Pension Fund Plan Does Not Preclude Mr. Dymond from Receiving Retirement Benefits*

The Pension Fund relies upon three sections of the Pension Fund Plan to disqualify Mr. Dymond from receiving benefits. None of these sections precludes Mr. Dymond from receiving payment for his ownership interest in Blue Diamond.

"A Participant is 'retired' within the meaning of the Plan Document, if he has ceased <u>working</u> in Covered Employment, as well as in any Disqualifying Employment, and such cessation of <u>work</u> is <u>intended</u> to be permanent." Pension Fund Plan § 5.01. (emphasis added).

As noted, Mr. Dymond ceased working in the sheet metal industry in 2003. He intends his cessation of work to be permanent. FAD has never, and does not intend to, perform any work. Again, FAD is an entity designed for the sole purpose of structuring the sale of Blue Diamond. Therefore, the plain meaning of § 5.01 dictates that Mr. Dymond is retired.

The Pension Fund next relies on Mr. Dymond's alleged employment with FAD to recoup benefits. Pursuant to the Pension Fund Plan at § 8.06(d)(1)(E), an individual is engaged in disqualifying employment where he possesses "employment in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer."

Mr. Dymond is not employed by FAD to participate in the sheet metal industry. FAD's sole purpose was to facilitate the sale of Blue Diamond in a tax advantageous manner, and FAD is a dissolved entity. All payments from FAD to Mr. Dymond are payments for the sale of Blue Diamond, not for work performed in the sheet metal industry.

Finally, the Pension Fund relies on the Pension Fund Plan at § 8.06(d)(1)(B). Pursuant to that section, an individual is engaged in disqualifying employment where he possesses "employment with any employer in the same or related business as any Contributing Employer."

Neither Mr. Dymond nor FAD did were employed in the same or related business of any Contributing Employer. Once again, Mr. Dymond is not an employee of FAD, and

{00681029.RTF;1 }

Robinson Brog Leinwand Greene Genovese & Gluck P.C.

RECEIVED JUL 2 1 2014

FAD's sole purpose is to provide a tax advantageous mechanism for the sale of Blue Diamond. FAD is not, and never has been, engaged to perform any work at all, let alone in the sheet metal industry similar to the entities cited by the Fund. As indicated above, FAD was dissolved. Therefore, based on the plain meaning of § 8.06(d)(1)(B), no services related to those of a Contributing Employer have been provided.

### III. CONCLUSION

For all of the reasons stated above and the documentary evidence contained herein, we request that Mr. Dymond's status with the pension fund be immediately reinstated, any funds previously withheld be paid, and that he continue to be eligible for the pension provided to him.

Thanking you in advance,

Very truly yours,

Michael E. Greene

MEG/bb

{00681029.RTF;1 }

RECEIVED JUL 2 1 2014

Exhibit A

RECEIVED JUL 2 1 2014

## SHARE PURCHASE AGREEMENT

AGREEMENT, dated as of this 1st day of January, 2001, by and among DANIEL DYMOND, residing at 41 Woodbury RD. , Farmingville, New York 11738 ("Seller"), ROBERT LAWLESS, residing at 13 S. Howells Pt. Road, Bellport, New York 11713 ("Lawless"), DOUGLAS ROBERT BELZ, residing at 22 S. Gillette Avenue, Bayport, New York 11705 ("Belz"), STEPHEN DIMEGLIO, residing at 335 Lagoon Drive South, Coplague, New York 11726 ("DiMeglio") and JAMES DVORAK, residing at 179 Oakwood Avenue, Bayport, New York 11705 ("Dvorak" and together with Lawless, Belz and DiMeglio, the "Purchasers");

### W I T N E S S E T H:

WHEREAS, Dymond and Lawless are each the owners of twenty (20) shares of the common stock of Blue Diamond Sheet Metal, Inc., a New York corporation ("BDSM"), constituting in the aggregate one hundred (100%) percent of the issued and outstanding shares of the common stock of BDSM;

WHEREAS, subject to the provisions contained in this Agreement, Seller wishes to withdraw from the ownership, management and operations of BDSM; and

WHEREAS, Seller desires to sell the shares of BDSM owned by him (the "Shares") to the Purchasers, and the Purchasers desire to purchase the Shares upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the covenants, conditions and terms contained in this Agreement and the performance of the agreements being executed contemporaneously herewith to give effect to the parties' intentions, the sufficiency of which the parties acknowledge, the parties agree as follows:

1. **Sale of Shares.** Seller hereby agrees to sell, transfer and assign to the Purchasers and each of the Purchasers hereby agrees to purchase, all of Seller's entire right, title and interest in the Shares upon the terms and conditions set forth herein and in the following amounts:

    (a)  Lawless   -   four (4) Shares;

    (b)  DiMeglio  -   five and one-third (5 1/3) Shares;

    (c)  Dvorak    -   five and one-third (5 1/3) Shares; and

    (d)  Belz      -   five and one-third (5 1/3) Shares.

2. **Purchase Price.** The purchase price per Share shall be Eleven Thousand Six Hundred Sixty Six and 66/100 ($11,666.66) Dollars (the "Purchase Price"), payable as follows:



RECEIVED JUL 2 1 2014

(a) At the closing ("Closing"), each Purchaser shall execute and deliver to Seller a self-liquidating, non-negotiable, secured promissory note (the "Note") substantially in the form annexed hereto as Exhibit A, bearing interest at the rate of eight and one-half (8 ½%) percent per annum and in the principal amount equal to the aggregate Purchase Price for the Shares being purchased by such Purchaser and providing for equal payments of principal and interest over a period of ninety six (96) consecutive months. The Note shall provide that (x) upon a default in any payment under the Note which remains uncured for sixty (60) days after the due date thereof, the entire unpaid principal of and accrued interest on such Note shall be immediately due and payable, and (y) the maker shall have the right of prepayment without penalty at any time.

(b) (i) At Closing, Seller shall deliver to Ruskin, Moscou, Evans & Faltischek, P.C., as escrow agent (the "Escrow Agent") the following:

(A) all certificate(s) representing the Shares;

(B) blank stock powers, properly executed, with all necessary transfer stamps affixed;

(C) a letter of resignation from Seller as an officer of BDSM; and

(D) such other documentation as may be reasonably required by the Purchasers in connection with the transactions contemplated herein.

(ii) The Escrow Agent shall hold all of the certificates, stock powers and other documents delivered above as security for the payment of each Note.

(iii) So long as a Purchaser is not in default under his respective Note, he shall have the right to vote his Shares held in escrow, and Seller shall, on demand, execute and deliver an effective proxy or proxies in favor of such Purchaser.

(iv) Upon receipt of written notice by the Escrow Agent of payment in full of a Purchaser's Note, the Escrow Agent shall deliver a copy thereof to Seller. If within fifteen (15) days thereafter written notice is not delivered by Seller contradicting such notice, the Escrow Agent shall deliver the Shares purchased by such Purchaser to him.

(v) If the Escrow Agent receives evidence of an Event of Default (as defined in the Note) at any time prior to the fifteenth (15th) day after delivery of the Escrow Agent's written notice above and notify the defaulting Purchaser (a "Defaulting Purchaser"), which notice is not contradicted by written notice delivered to the Escrow Agent by the Defaulting Purchaser, the Escrow Agent shall sell the Defaulting Purchaser's Shares held in escrow and all other property, if any, held in escrow at a public or private sale upon at least ten (10) days' advance written notice to the parties, in which case Paragraph 2(b)(vii) shall apply. The Escrow Agent shall apply the proceeds of any sale in the following order: (w) to the payment of expenses of sale, including reasonable attorney's fees; (x) to the payment of all

RECEIVED JUL 2 1 2014

accrued interest on the Note; (y) to the payment of the outstanding principal balance on the Note; and (z) to such Purchaser. Seller shall also retain any and all rights and remedies available at law.

   (vi) If the Escrow Agent receive conflicting notices from Seller and the Defaulting Purchaser, the Escrow Agent shall not act in response to either notice and shall thereafter act only in accordance with any of the following:

    (A) A new notice signed by each of the Seller and the Defaulting Purchaser; or

    (B) A certified copy of a judgment of a court of competent jurisdiction, as to which the Escrow Agent shall have received an opinion of counsel satisfactory to the Escrow Agent in its joint and absolute discretion, that such judgment is final beyond appeal.

   (vii) Upon performance of its duties in accordance with the provisions hereof, the Escrow Agent shall be relieved and discharged of any and all liabilities hereunder. The Escrow Agent shall in no event have any liability for any act or omission to act, except those acts and/or omissions which constitute gross negligence or willful misconduct, and shall be indemnified and held harmless, jointly and severally, by Seller and Purchasers from and against any loss, liability and expense incurred without gross negligence or will misconduct on the part of the Escrow Agent arising out of or in connection with the acceptance by the Escrow Agent of its duties hereunder, including the cost and expense of defending any claim of liability hereunder.

   (viii) With respect to the Shares that are held in escrow, this provision is intended to and will create a security interest in favor of Seller pursuant to the Uniform Commercial Code, in addition to such other rights and remedies available under other applicable law.

  3. <u>Covenants Until Full Payment of the Notes</u>

  Until the satisfaction of the Notes delivered at Closing:

  (a) The Purchasers shall not sell or otherwise transfer the assets, property or shares of BDSM or permit the same to be sold or transferred, except in the ordinary course of business, or increase the authorized or outstanding shares of BDSM's Common Stock (by issuance, sale or otherwise) or vote to merge, consolidate or otherwise combine BDSM with any other entity; and

  (b) The Purchasers shall permit Seller to inspect the books and records of BDSM at Seller's own cost and expense upon reasonable notice and during normal business hours, provided, however, that such inspection shall not occur more often than once during each period of ninety (90) days.

RECEIVED JUL 2 1 2014

4. <u>Withdrawal of Seller</u>.

Effective as of the date hereof, Seller shall:

(a) terminate his full-time employment with BDSM;

(b) unless otherwise agreed to by the Purchasers and Seller, no longer serve as an officer, director or authorized agent of BDSM;

(c) if applicable, submit his written resignation to confirm the termination of his status with respect to each position currently held; and

5. <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Purchasers as follows:

(a) he is the record and beneficial owner of the Shares;

(b) he has full right, power, authority and capacity, to sell, transfer, and deliver such Shares in accordance with the terms of this Agreement;

(c) upon delivery thereof as herein contemplated, each Purchaser will receive good and marketable title to the Shares purchased by such Purchaser;

(d) the Shares are free and clear of any claims, liens, pledges and encumbrances of any kind, except as set forth herein;

(e) the Shares in the aggregate constitute fifty (50%) percent of the issued and outstanding shares of common stock of BDSM;

(f) there are no warrants, options or other rights granted to third parties by Seller or BDSM; and

(g) BDSM's capitalization consists of two hundred (200) shares of stock, of which forty (40) shares are issued and outstanding.

6. <u>Representations and Warranties of each Purchaser</u>. Each Purchaser hereby represents and warrants to Seller as follows:

(a) He has full right, power, authority and capacity to enter into this Agreement and to carry out the transactions contemplated herein.

(b) The execution, delivery and performance of this Agreement will not violate any law, order, judgement or writ of any governmental authority or any provision of any contract or agreement to which he is a party to or to which his property is subject.

7. <u>Continuing Indemnification</u>.

RECEIVED JUL 2 1 2014

(a) BDSM shall continue to indemnify and hold Seller harmless from and against any personal liability associated with his activities as an officer, director or authorized agent of BDSM, to the fullest extent permitted by law as if Seller were still an officer, director or authorized agent thereof, except to the extent that such obligation arises in contravention of any warranties and representations of Seller contained herein.

(b) Each of BDSM and Purchasers agree to indemnify and hold Seller harmless from and against any and all obligations which might arise to lending institutions and sureties where Seller currently has delivered his personal guaranty with respect to obligations of BDSM.

8. <u>Release of Guarantees</u>. BDSM and the Purchasers will use their best efforts to secure a release of any personal guaranty given by Seller in furtherance of the business of BDSM and agree to provide all documentation requested by the beneficiary of any such guaranty to facilitate such release within a reasonable time following such request.

9. <u>Default Under Consulting Agreement</u>. The parties acknowledge that BDSM intends to enter into a certain consulting agreement (the "Consulting Agreement") with an entity to be formed called F.A.D. Consulting Corp. ("Consultant") under which Consultant will agree to make the services of Seller and other employees of Consultant available to BDSM in consideration for certain consulting payments. The parties hereby agree that a material default by BDSM under the Consulting Agreement shall be considered a material default of each Purchaser's obligations hereunder.

10. <u>Arbitration</u>. Any controversy or claim arising out of or relating to this Agreement, or any breach of any term or provision hereof, shall be settled by arbitration before a panel of three arbitrators. One arbitrator shall be selected by each party to the controversy within ten (10) business days after demand for the arbitration is made, and a third neutral arbitrator shall be appointed by the two (2) arbitrators selected by the parties. If the two (2) arbitrators are unable to agree on the third arbitrator, the court may appoint the third arbitrator in accordance with CPLR §7504. Unless otherwise agreed in writing, any arbitration shall be conducted in accordance with the rules of the American Arbitration Association in the State and County of Nassau, each party expressly consenting to the exclusive locale for all proceedings arising from or related to a demand for arbitration. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction over the parties.

11. <u>Miscellaneous</u>.

(a) <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of New York without regard to its conflicts of laws principles.

(b) <u>Survival and Enforceability</u>. All covenants, agreements, representations, warranties and acknowledgments made herein shall survive the execution and delivery of this Agreement and the issuance, sale and delivery of any stock or partnership interest, and shall be

C:\My Documents\BlueDiam\# 146797 v2 - Blue Diamond Share Purchase Agreement.doc

RECEIVED JUL 2 1 2014

enforceable directly by the parties hereto, notwithstanding any action, inaction, compromise, release or abandonment of any right, promise or claim by any party hereto.

(c) Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter and supersedes all prior or existing understandings, agreements, letters of intent or promises (whether in writing or oral) between the parties hereto.

(d) Counterparts. This Agreement may be executed in one or more counterparts, including facsimile counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(e) Modification. This Agreement may not be amended or modified, and no provision hereof may be waived, without the written consent of each party hereto.

(f) No Adverse Construction. The rule that an agreement is to be construed against the party drafting the agreement is hereby waived, and shall have no applicability in construing this Agreement or any provision hereof.

(g) Captions. The captions contained in this Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Agreement.

(h) Termination of Stockholder's Agreement. The Stockholder's Agreement dated as of August 14, 1996, by and among Seller, Lawless and BDSM is hereby terminated in its entirety and of no further force or effect.

12. Notice. Any notice, report, demand, waiver or consent required or permitted to be given hereunder, or under any modification or amendment hereto, shall be in writing and delivered personally or sent by registered or certified mail, return receipt requested, to the addresses of the parties as first set forth above. A copy of any notice sent to any party shall be sent to Ruskin, Moscou, Evans & Faltischek, P.C., 170 Old Country Road, Mineola, NY 11501, Attention: Michael L. Faltischek, Esq. Any party may change the address to which notices, etc., are to be sent by giving written notice of such change of address to the other parties as provided in this Section.

RECEIVED JUL 21 2014

IN WITNESS, WHEREOF, the undersigned have signed and delivered this Agreement as of the date and year first written above.

_____
DANIEL DYMOND

_____
ROBERT LAWLESS

Agreed and accepted with respect to the provisions contained in Sections 4, 7, 8 and 9.

BLUE DIAMOND SHEET METAL, INC.

By: _____ Pres
    Robert Lawless, President

_____
DOUGLAS ROBERT BELZ

_____
STEPHAN DIMEGLIO
STEPHEN DIMEGLIO

_____
JAMES DVORAK

Agreed and accepted with respect to the provisions contained in Section 2(b).

RUSKIN, MOSCOU, EVANS & FALTISCHEK, P.C., as Escrow Agent

By: _____
    Michael Faltischek, Partner

C:\My Documents\BlueDiam\W146797 v2 - Blue Diamond Share Purchase Agreement.doc

RECEIVED JUL 2 1 2014

## EXHIBIT A

"Form of Promissory Note"



RECEIVED JUL 21 2014

Exhibit B

**BLUE DIAMOND
SHEET METAL, INC.**



36 Commercial Blvd., Medford, N.Y. 11763

RECEIVED JUL 21 2014

(516) 698-6330   Fax (516) 698-6697

March 28, 2001

Mr. Daniel Dymond
481 Woodbury Lane
Farmingville, NY 11738

RE:   Agreement Not to Compete

Dear Mr. Dymond:

In consideration of, and connection with the execution, delivery and performance of that certain (a) Share Purchase Agreement of even date herewith, by and among yourself, Robert Lawless, Douglas Robert Belz, Stephen Dimeglio and James Dvorak (the "Share Purchase Agreement"), and (b) Consulting Agreement of even date herewith, by and between Blue Diamond Sheet Metal, Inc. ("Blue Diamond") and F.A.D. Consulting Corp. ("F.A.D.") (the "Consulting Agreement"), you hereby confirm that during the term of the Consulting Agreement and for a period of two (2) years thereafter, neither you, nor any entity which you are affiliated with (including, without limitation, F.A.D.), shall, without the prior written consent of Blue Diamond, directly or indirectly, either individually or as an employee, agent, partner, shareholder, director, consultant, employer, lender of money, guarantor or in any other capacity whatsoever, participate in, engage in or have a financial interest, management position or other interest in any business, firm, corporation or other entity that competes against Blue Diamond Sheet Metal, Inc. by engaging or providing sheet metal design, contracting or engineering services within a fifty (50) mile radius of Blue Diamond's principal office.

Please acknowledge your understanding of the foregoing where indicated below.

Very truly yours,

Robert Lawless
President

AGREED AND ACKNOWLEDGED:

By: _____
Daniel Dymond